UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

REBECCA WEST,

       Plaintiff,                                 Case No. 14-cv-10121
                                             Hon. Matthew F. Leitman

v.

CITY OF GARDEN CITY *et al.*,

       Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (ECF ## 33, 35, 36, 37, 38)

Plaintiff Rebecca West ("West") has lived a difficult life. She suffers from multiple mental illnesses, including bipolar disorder; has a history of abusing cocaine, heroin, and other drugs; was kicked out of high school; worked as a prostitute; and has been in and out of jail on a variety of charges. West says that she turned to a life of drugs and prostitution because officers and employees of the Garden City Police Department sexually assaulted her when she was a teenage volunteer for the department in 1990 and 1991. Nearly twenty-five years later, West filed this civil action against the men she says raped her and/or covered up the assaults and against the city that employed them. The Defendants vehemently deny West's accusations.

If West's allegations are true, she suffered unspeakable harm at the hands of the very people tasked with protecting and mentoring her.  But the Court has not considered, and expresses no opinion concerning, the truth or falsity of West's allegations and the Defendants' denials.

Instead of addressing the merits of West's accusations, the Court has first considered Defendants' argument that the applicable statutes of limitations bar all of West's civil claims.  West admits that her action is untimely on its face, but she argues that she may nonetheless proceed because the statutes of limitations were tolled by her insanity.  The Court disagrees.  West has not presented sufficient evidence to create a genuine dispute of material fact as to whether she was continuously insane (or insane at all) and thus entitled to invoke the Michigan statute that provides for tolling due to insanity, Mich. Comp. Laws § 600.5851(1) (the "Insanity Tolling Statute").  West's other proffered bases for tolling the statutes of limitations on equitable grounds likewise fail as a matter of law. Because all of West's claims are time-barred, the Court **GRANTS** summary judgment in favor of Defendants on all of West's claims.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    West's Allegations of Sexual Assault

In 1989, when West was fifteen years old, she joined the "Police Explorer" program at the Garden City Police Department.  (*See* West Deposition, ECF #36-2 at 67, 116, Pg. ID 489, 501.)  The Police Explorer program "allow[ed] teenagers the opportunity to experience law enforcement as a potential career.  The opportunities included police related training, patrol ride-alongs, and other such police related activities."  (Complaint, ECF #1 at ¶7.)

West alleges that on several occasions during 1990 and 1991, Defendants Kevin Nowak ("Nowak"), Thomas Wallace ("Wallace"), Richard Sundstrom, and Mark D'onofrio sexually assaulted her. (Compl. at ¶¶ 9-15.)  At that time, these Defendants were employed by the Garden City Police Department.

West further contends that Defendants Fred Sayger ("Sayger"), David Harvey, and Michael Bertha (each of whom were Garden City Police Officers during the relevant time period) "used their positions of authority to conspire with, and/or cover-up, the assaults and battery."  (*Id*. at ¶24.)  Finally, West says that many of the Defendants, including Wallace, Sayger, and Nowak, encouraged her to "keep quiet" and not report the alleged abuse.  (West Dep. at 110-111, 115, 117, Pg. ID 500-502.)

**B.** **Following the Alleged Assaults, West Begins Abusing Drugs, Struggles to Find Steady Employment, and Places Three Children for Adoption**

West says that she began abusing alcohol and other drugs, including "marijuana, crack, [and] heroin" as a way to "self-medicate[]" following the assaults. (*Id.* at 17, 24-25, Pg. ID 477-479.) As a result of her drug use, West was "thrown out of high school." (*Id.* at 25-26, Pg. ID 479.) By the time West turned 18, she had become, in her own words, "a drug addict, and soon thereafter, a prostitute." (Compl. at ¶23.) West insists that she turned to drugs and prostitution as a "direct result[] [of] the emotional and physical abuse placed upon her by the Defendant's [sic] actions." (*Id.*)

West also struggled to find steady employment. West says that since the early 1990s, she has worked at 7-Eleven, Farmer Jack, Sumitomo Wiring Systems, Big Boy's, Athena Café, Wendy's, Taco Bell, Tim Horton's, Subway, Ram's Horn, and as a direct care worker for elderly individuals, among other jobs. (*See* West Dep. at 41-48 Pg. ID 483-484.) West says that she could not "hold a job" and that she stayed at each employer for only a few months at a time on average. (*Id.* at 41, Pg. ID 483.)

In addition, during her period of drug use, West placed three children for adoption – in 1998, 2000, and 2006. (*See id.* at 29-30, Pg. ID 480.) West believes she had to sign legal paperwork to complete the adoptions. (*See id.*) The record

4

does not contain any evidence that any party connected to the adoption process raised any concerns about West's competency to execute those documents or to place her children for adoption.

### C.   West Pleads Guilty to Various Criminal Charges, and State Courts Find Her Competent to Enter Those Pleas

In 2000 and 2001, West pleaded guilty to several criminal charges.  For example, in June 2000, West pleaded guilty to driving with her license suspended and with expired plates (*see* ECF #36-6 at 2-8, 14-16, Pg. ID 534-540, 546-548); in March 2001, West pleaded guilty to possession of a syringe (*see* ECF #36-7 at 11-15, Pg. ID 559-562 ); and in July 2001, West was again charged with driving with a suspended license, and she pleaded guilty to driving with expired plates. (*See* ECF #36-6 at 9-10, 13, Pg. ID 541-542, 545.).[1]  Under the Michigan Court Rules, the state trial courts could not have accepted West's guilty pleas if they had any reason to question West's competency, *see* MCR 6.125; Mich. Comp. Laws § 330.2020, and, at least one state-court judge affirmatively found that West had "knowingly, intelligently, and voluntarily" waived her right to counsel when she pleaded guilty.  (ECF #36-7 at 8, 12, 16, Pg. ID 556, 560, 564.)  The record contains no evidence that West or any other party or court raised any concerns about her competency during any of the criminal proceedings against her.

---

[1]  West further testified that she was arrested in Detroit in 2000, 2002, and 2004 for either prostitution or illegal drugs.  (*See* West Dep. at 50-51, Pg. ID 485.)

**D**     **West Unsuccessfully Attempts Treat Her Drug Addiction**

In 2005 and 2006, West received treatment for her drug addictions.  West first entered a drug treatment program at the Oakdale Recovery Center ("Oakdale") after she became pregnant in 2005.  (*See* West Dep. at 30, 59-60; Pg. ID 480, 487.) West says she did not complete the treatment, and upon leaving Oakdale, she immediately "got back on [drugs]."  (*Id.* at 30, Pg. ID 480.)

West was also hospitalized at the Psychiatric Intervention Center ("PIC") for at least two weeks in 2006.  (*See id.* at 23-24, Pg. ID 478.)  West says that the doctors at PIC "concentrate[ed] on [her] drug use" and she "didn't stay long enough to get to [her] mental issues because they just thought it was the drugs." (*Id.* at 24, Pg. ID 478.)  West's drug use continued after her discharge from PIC.

**E.**     **West Reports the Alleged Abuse to Former Garden City Police Officer Lyle Dickson, and She Engages Dickson as Her Attorney**

In 2013, West contacted Lyle Dickson ("Dickson"), a former Garden City police officer whom she remembered from her time as a Police Explorer.  (*See id.* at 33, 76, Pg. ID 481, 491.)  Dickson is now a practicing attorney.  West says she contacted Dickson as part of "trying to get [her] life together" and "tak[ing] [her] life back so [she] can be normal."  (*Id.* at 81, Pg. ID 83.)  In July 2013, West told Dickson about the alleged sexual assaults (*see* ECF #36-3 at 7, Pg. ID 509), and she thereafter retained him as her attorney.

6

**F.     Dickson Reports the Alleged Assaults to the Michigan State Police, and West Files This Civil Action Against the Defendants**

In August 2013, Dickson contacted the Michigan State Police to report that he had a client (West) who claimed to have been sexually assaulted by employees of the Garden City Police Department.  (*See id.* at 10, Pg. ID 512.)  Dickson told the State Police that his client was "scared to come forward" because some of the employees were still working for the police department.  (*Id.*)  West later agreed to be interviewed by the Michigan State Police.  The State Police determined that criminal charges could not be pursued because the criminal statute of limitations had expired.  (*See id.* at 4-5, Pg. ID 506-507.)

West thereafter filed this civil action on January 13, 2014.  (*See* ECF #1.) She brings state-law claims for "assault and battery" and "negligence - fail to train, fail to properly hire," and she also asserts claims for violations of her constitutional rights under 42 U.S.C. § 1983.  (*See id.*)

**G.     Nearly 11 Months After Filing This Action, West Again Enters Treatment for Her Drug Addictions and Mental Illnesses**

In November 2014 – almost 11 months after filing this action – West began treatment with Lincoln Behavioral Services ("LBS") for her drug addictions and mental illnesses. (*See id.* at 32-33, Pg. ID 480-481; ECF #36-5 at 5, Pg. ID 530.) One of West's counselors at LBS is Suhasini Mistry, Ph.D.  In a letter about West, Dr. Mistry opines that West "demonstrates symptoms which are congruent with a

diagnosis of Bipolar I disorder….”   (ECF #36-5 at 5, Pg. ID 530.)   Dr. Mistry also

concludes that West likely suffers from post-traumatic stress disorder.   (*See id.*)

Finally, Dr. Mistry says that West's delay in reporting the alleged sexual abuse is

not uncommon:

> Reportedly, as a child, Ms. West was sexually assaulted by
> local law enforcement officers.   For many years she did not
> report the assault.   It is not uncommon for a victim to wait
> months, years, or, even a lifetime to report a crime of sexual
> assault.   Every victim's experience is different and the recovery
> progress can be extremely difficult.   Therefore, there is no
> standard or "appropriate" victim response.   Given the endured
> trauma, anxiety, fear, depression, and re-experiencing the
> traumatic event, Ms. West most likely attempted to cope
> without legal involvement.

(*Id.*)

West has also received treatment from LBS social worker and therapist

Heather Pebbles ("Pebbles").   Pebbles believes that "the catalyst to Ms. West's

mental illness was sexual abuse that occurred during [West's] teens."   (ECF #36-5

at 7, Pg. ID 532.)

> ### H.   Dr. Viken Matossian Evaluates, But Does Not Treat, West and Offers Opinions Concerning West's Delay in Reporting the Alleged Sexual Abuse

In December 2014, West met once with Dr. Viken Matossian, a psychiatrist.

Dr. Matossian evaluated West, but he did not treat her.   Dr. Matossian and West

discussed the alleged incidents of sexual assault, West's history of drug use, and

her mental illnesses.   (*See* ECF #36-4.)   Dr. Matossian observed that West

8

"became angry about [the alleged assaults] much later in life, as she got into prostitution herself, and even moreso as she tried to get away from drugs and prostitution in 2005-6." (*Id.* at 6, Pg. ID 523.)  Dr. Matossian further noted that West denied "being afraid to speak about what happened with the officers, but [told him that] it was upsetting enough that she used drugs to keep it out of her mind most of the time." (*Id.*)  Dr. Matossian concluded that if the sexual assaults occurred, they "likely have contributed substantially to [West's] choices to use drugs, engage in illegal behavior, and get involved in prostitution." (*Id.*)  Dr. Matossian then opined that it may have been "difficult or impossible" for West to "recognize or report" the abuse:

> From [the time of the alleged assaults and drug abuse forward, West's] defenses became hardened and she identified more as an aggressor than a victim, and would not have seen herself as a victim until quitting prostitution in favor of a less unhealthy relationship.  This is a pattern that is almost always a marker for, and consequence of, sexual abuse or exploitation. [E]motional instability and intermittent psychotic symptoms are most likely related to drugs and trauma created by poor choices stemming from her inability or recognize her own vulnerability. […] Regardless, from the point that we conclude sexual abuse by the police officers occurred, we can subsequently conclude that emotional consequences of such abuse made it difficult or impossible for her to report or recognize her victimization as a teen until the past year or two, when she has started to work on recovering and improving her life.

(*Id.*)

In May 2015, after Defendants filed their motions for summary judgment, Dr. Matossian reviewed additional information provided by West's mother. In a follow-up letter, he opined that "for most of the intervening years" it has been "impossible" for West to "advocate for herself" with respect to the alleged sexual assaults:

> [West's] mental illness continues to the present time, but has improved gradually as her life circumstances are becoming more emotionally, financially, and physically secure. Her illness led to a process of dissociation, in which she was unable to tolerate the emotional distress generated when she recalled her original trauma of sexual abuse by police officers in her teenage years. This has made it impossible for most of the intervening years to advocate for herself on this issue. A dissociative mental process such as this has some specificity to the original traumatic events. It is entirely consistent for Ms. West to be able to advocate for herself assert herself vigorously on other issues, and to function in work settings despite her emotional in ability to address the issue of sexual assault by police officers. She put this issue out of her mind to adapt and survive over the years. At the same time, she engaged in severely dysfunctional behavior that further allowed her to lesson [sic] the fear, shame and helplessness of the original traumatic events because those dysfunctional behaviors allowed her to feel sexually powerful and emotionally disconnected.

(ECF #40-7, Pg. ID 819.)

## I.    The Court Bifurcates the Proceedings in this Action

On January 12, 2015, the Court entered an order limiting the initial discovery in this action to matters related to Defendants' limitations defense and allowing all Defendants to file an early summary judgment motion limited to that

defense.  (*See* ECF #32.)  Defendants each filed such a motion, and West has responded.  The Court held a hearing on Defendants' motions on July 1, 2015.

## **GOVERNING LEGAL STANDARD**

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact...." *U.S. SEC v. Sierra Brokerage Services, Inc.,* 712 F.3d 321, 326–27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986)) (quotations omitted).  When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.*  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson,* 477 U.S. at 252.  Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251-252.  Indeed, "[c]redibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge…" *Id.* at 255.

## ANALYSIS

### A.   The Applicable Statutes of Limitations

There is a two-year limitations period applicable to West's state-law assault and battery claim, *see* M.C.L. § 600.5805(2), and a three-year limitations period applicable to her state-law negligence claim.  *See* M.C.L. § 600.5805(10).  With respect to West's federal claim under § 1983, this Court "must look to state law to determine the appropriate limitations period." *Roberson v. Tennessee*, 399 F.3d 792, 794 (6th Cir. 2005).  Where, as in Michigan, "state law provides multiple statutes of limitations for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions."  *Owens v. Okure*, 488 U.S. 235, 250 (1989).  In Michigan, this limitations period is three years.  *See* M.C.L. § 600.5805(10).  Thus, "the appropriate statute of limitations to be borrowed for § 1983 actions arising in Michigan is the state's three-year limitations period for personal injury claims." *Wolfe v. Perry*, 412 F.3d 707 (6th Cir. 2005); *see also Fleece v. Rhines*, 3 Fed. App'x 300, 302 (6th Cir. 2001) (applying Michigan's three-year limitations period in § 1983 action alleging, among other things, assault and battery).

### B.   The Insanity Tolling Statute and its Application at the Summary Judgment Stage

West acknowledges that absent tolling, all of her claims would be barred by the applicable statutes of limitations. (*See, e.g.,* ECF #44 at 9, Pg. ID 933.)  West

12

insists the Insanity Tolling Statute provides the necessary tolling.[2]  In relevant part,

that statute provides that:

> [I]f the person first entitled to make an entry or bring an action under this act is … insane at the time the claim accrues, the person or those claiming under the person shall have 1 year after the disability is removed through death or otherwise, to make the entry or bring the action although the period of limitations has run.

M.C.L. § 600.5851(1).  Under the Insanity Tolling Statute, "where [a] plaintiff is

deemed insane at the time the claim accrues, the plaintiff is permitted a year of

grace from the time when the disability is removed in which to file his or her

claim."  *English v. Bousamra*, 9 F.Supp.2d 803, 808 (W.D. Mich. 1998), *aff'd* 188

F.3d 507 (6th Cir. 1999) (Table) (internal quotation marks omitted).

The Insanity Tolling Statute defines the term "insane" to mean "a condition

of mental derangement such as to *prevent the sufferer from comprehending rights*

*he or she is otherwise bound to know* and is not dependent on whether or not the

person has been judicially declared to be insane."  M.C.L. § 600.5851(3) (emphasis

---

[2] West was under 18 years of age when her claims accrued.  Her age could have provided another basis on which to toll the statutes of limitations. *See* M.C.L. § 600.5851(1) (providing for tolling based upon infancy in addition to tolling based upon insanity).  But because West is relying upon her alleged insanity to toll the limitations period, she may not also seek tolling based upon her infancy.  Michigan law expressly prohibits a plaintiff from tacking these two disabilities together. *See* M.C.L. § 600.5851(4).  At the hearing on Defendants' motions, West's counsel confirmed that West seeks to toll the limitations periods solely based upon her claimed insanity and that she is not relying upon her infancy.

added).  While "one need not be a blithering idiot in order to raise the defense of mental derangement under this statutory provision," *Davidson v. Baker–Vander Veen Construction Co*., 192 N.W.2d 312, 316 (Mich. App. 1971), courts in recent years have concluded that "only a severe mental impairment will justify excusing plaintiff from bringing suit."  *English*, 9 F.Supp.2d at 809.  The Sixth Circuit has explained that a plaintiff may establish insanity under the Insanity Tolling Statute by showing, among other things, that he or she:

> 1) was "unable to work with his retained attorneys[;]" *Makarow v. Volkswagen*, 157 Mich.App. 401, 405, 403 N.W.2d 563 (1987); 2) "was unable to comprehend or assist his attorney in asserting the cause against the defendant[;]" *Hill v. Clark Equipment Co*., 42 Mich.App. 405, 407, 202 N.W.2d 530 (1972); and 3) was "unable to attend to personal and business affairs," "that it was necessary to explain to [plaintiff] matters the ordinary person would understand," and that "he was unable to comprehend simple legal procedures." *Davidson v. Baker–Vander Veen Construction Co.*, 35 Mich.App. 293, 298, 192 N.W.2d 312 (1971).

*Britt v. Smith*, 9 Fed. App'x 409, 410-411 (6th Cir. 2001) (quoting *English*, 9 F.Supp.2d at 809).

The plaintiff "bear[s] the burden of demonstrating that [she is] entitled to the benefit of [the Insanity Tolling Statute]."  *English*, 9 F.Supp.2d at 808 (citing *Warren Consolidated Schools v. W.R. Grace & Company*, 205 Mich.App. 580, 583, 518 N.W.2d 508 (1994) ("[W]here it appears that the cause of action is prima facie barred, the burden of proof is upon the party seeking to enforce the cause of

14

action to show facts taking the case out of the operation of the statute of limitations[.]")).  To carry that burden, a plaintiff must establish that (1) she suffered from a condition rising to the level of insanity under the Insanity Tolling Statute, (2) her insanity "existed when the claim accrued" and was "continuous," and (3) she filed her lawsuit within one year of regaining her sanity.  *Curran v. City of Dearborn*, 957 F.Supp.2d at 884 (internal citations omitted).

While a plaintiff seeking to invoke the Insanity Tolling Statute has the ultimate burden of proof, a defendant seeking summary judgment on a limitations defense has the initial burden of production with respect to the insanity issue:

> At the summary judgment stage, the defendant bears the initial burden of demonstrating the absence of a genuine issue of material fact on the question of insanity, [and] once he has done so, the plaintiff must present evidence sufficient to show that a reasonable jury could find in [her] favor [on the insanity issue].

*Id.* (quoting *English*, 9 F.Supp.2d at 808).

### C. The Insanity Tolling Statute Does Not Save West's Time-Barred Claims

#### 1. Defendants Have Carried Their Initial Burden of Demonstrating the Absence of a Material Factual Dispute on the Issue of West's Claimed Insanity

The Defendants have presented persuasive evidence that West cannot satisfy the requirements for invoking the Insanity Tolling Statute.  Most importantly, Defendants have shown that West's own deposition testimony is inconsistent with her current argument that she did not comprehend her legal rights during the entire

time she seeks to toll and that this lack of comprehension caused her delay in filing her civil action against the Defendants.  West admitted that she remembered the assaults throughout her life and that she always knew the assaultive behavior was wrong.  (*See, e.g.,* West Dep. at 27, 70-71, Pg. ID 479, 490.)  And when West was asked to identify anything that "prevented" her from reporting the alleged assaults, *she did not say that she was unable to make a report because she did not comprehend her rights*. (*See id.* at 90, 93, Pg. ID 495-496.)  Instead, West offered two explanations for her delay in reporting the assaults: she feared that people would not believe her and that the police would "stick up for [her assaulters who were fellow police officers and police department employees]." (*Id.* at 24, 35, 90, 93, Pg. ID 478, 481, 495-496.)  Neither of these explanations has anything to do with West's currently-claimed inability to understand her legal rights.  On the contrary, these explanations suggest that West engaged in a two-step thought process that shows that West *did* understand that she had been wronged: in step one, she recognized that the Defendants violated her rights, and in step two, she concluded that reporting the wrong would be fruitless because nobody would believe her or act to remedy the wrong.  Finally, West admitted that she *was* able to report the alleged assaults to another member of the Police Explorers and to a former boyfriend. (*See id.* at 9-10, Pg. ID 475; *see also* ECF #36-3 at 7, Pg. ID 509.)  All of this evidence suggests that West *did* comprehend that the Defendants

violated her right to be free from sexual assaults and *did* comprehend that she could complain about their violations.

Defendants also have shown that West's legal history suggests that she was not continuously insane during the period she seeks to toll, as the Insanity Tolling Statute requires. As noted above, West pleaded guilty to criminal offenses several times times during the period during which she claims to have been insane. (*See, e.g.,* ECF ## 36-6 – 36-8.) During each of these criminal proceedings, "if the state judge even suspected that [West] was incompetent, [the judge] was obliged to stop the proceedings and refer her for a mental examination." *Curran*, 957 F.Supp.2d at 886 (citing Michigan Court Rule 6.125(C)(1)). But the record contains no evidence that any judge or court ever declared West insane or incompetent, and there is no evidence that any court ever raised any concerns about her competency. Indeed, as discussed above, at least one judge affirmatively found West had knowingly and intelligently waived her right to counsel when she pleaded guilty. (*See* ECF #36-7 at 8, 12, 16, Pg. ID 556, 560, 564.) That the state courts viewed West as competent further supports Defendants' argument that West's alleged insanity did not exist for the entire time that she seeks to toll. *See Curran,* 957 F.Supp.2d at 886 (treating evidence that state court accepted guilty plea by plaintiff in a criminal case as evidence that plaintiff was not insane).

Finally, Defendants point out that West placed three children for adoption and completed legal documents as part of that process – with no evidence in the record that any party connected to the adoption proceedings ever questioned her competency. West's participation in the adoptions is at least some evidence that she was able to comprehend her legal rights during the period that she seeks to toll.

In sum, the Defendants have identified sufficient evidence to demonstrate the absence of a material factual dispute on two of the essential elements that West must satisfy in order to prevail under the Insanity Tolling Statute: namely, whether West was ever insane and whether her insanity was continuous. Thus, the burden shifts to West to present evidence sufficient to permit a reasonable jury to find in her favor on those two issues.

>### 2. West Has Not Identified Evidence Sufficient to Create a Material Factual Dispute With Respect to Whether She Satisfies the Insanity Tolling Statute

West insists that she was insane within the meaning of the Insanity Tolling Statute, but she has not presented the type of evidence – identified by the Sixth Circuit in *Britt, supra* – that has persuaded courts to find a plaintiff insane. For instance, she has not shown that she has been "unable to work with [her] retained attorneys" or "unable to comprehend or assist [her attorney] in asserting the cause of action against the defendant[s]." *Britt*, 9 Fed. App'x at 410 (quoting *English*, 9 F.Supp.2d at 809). On the contrary, it appears that West was able to contact

18

Dickson, was able to provide him with sufficient information to draft and file her Complaint, and was able to work with him to prepare for her deposition.[3] Likewise, West has not presented any evidence that she was "unable to comprehend simple legal procedures" or that it "was necessary to explain [to her] matters the ordinary person would understand." *Id.* In fact, the available evidence – her entry of the guilty pleas and participation in several adoptions – suggests that she *was* able to comprehend simple legal procedures. And, while West has submitted evidence that she suffered through bouts of debilitating drug abuse, she

---

[3] West's ability to contact and assist Dickson – though not "conclusive" evidence that she is or was sane, *Davidson*, 192 N.W.2d at 315 – cuts against her claim that she was insane throughout the entire time that she seeks to toll. West first reached out to Dickson and worked with him in 2013. (*See* Michigan State Police Report, ECF #36-3 at 7, 10 Pg. ID 509, 512 – reflecting that West told Dixon of the assaults in "July 2013" and that Dickson first contacted the Michigan State Police on West's behalf on "August 13, 2013.") West has not offered evidence that explains how she had the mental capacity to assist Dickson at that time but somehow lacked that capacity in the preceding years. Notably, West's work with Dickson in 2013 occurred at least one year *before* West began the mental health treatment at LBS that, she says, is helping her to turn her life around. (*See* Dr. Mistry letter, ECF #36-5 at 5, Pg. ID 530 – reflecting that "Ms. West was admitted to this agency [LBS] for mental health treatment on 11/14/2014"; *see also* West Dep., ECF #36-2 at 33, Pg. ID 481, in which West discusses her treatment at LBS.) Thus, West's ability to work with Dickson in 2013 cannot be explained on the basis that it resulted from West's mental health counseling. Simply put, on the state of the record before the Court, there is no basis to conclude that West's mental condition in 2013 was materially different from her condition in the immediately preceding years, and the fact that West was able to understand her rights and begin the legal process with Dickson in 2013 suggests that she had the ability to do so in the prior years.

19

has not presented evidence that throughout the entire time she seeks to toll, she was "unable to attend to personal and business affairs." *Id.*[4]

West argues that the three letters (and one report) she has submitted from mental health professionals – Dr. Mistry, Ms. Pebbles, and Dr. Matossian – create a factual dispute with respect to whether she was insane during the relevant period. The Court disagrees. First, while the letters from Dr. Mistry and Ms. Pebbles do speak to West's mental illnesses and their potential root cause, those letters do not address whether West was insane *as defined by the Insanity Tolling Statute.* More specifically, these letters say nothing about whether West was able to comprehend

---

[4] The evidence submitted by West on the question of her sanity is substantially weaker than the evidence deemed sufficient by the Michigan Court of Appeals to preclude judgment as a matter of law under the Insanity Tolling Statute. For instance, in *Davidson, supra*, the court held that the question of the plaintiff's sanity should have been submitted to the jury because the plaintiff presented affidavits establishing that he "was unable to write and read, [] could sign his name only, [] he was poorly orientated as to time, [and] he did not know the date and month." *Davidson*, 192 N.W.2d at 314, n. 3. Likewise, in *Hill v. Clark Equipment Company*, 202 N.W.2d 530 (Mich. App. 1972), the Michigan Court of Appeals held that the question of plaintiff's sanity should not have been decided on summary judgment where a plaintiff submitted evidence that he "suffered from periodic blackouts," "has suffered certain losses of memory," and "suffered some intellectual impairment consistent with a diagnosis of chronic brain syndrome … and that this impairment was present at all times after his accident." *Id.* at 533. Finally, in *Makarow v. Volkswagen*, 403 N.W.2d 563 (Mich. App. 1987), the Court of Appeals held that the question of plaintiff's sanity should have been decided by the jury because an affidavit submitted on the plaintiff's behalf stated that the plaintiff's "mental and physical disabilities precluded him from cooperating with [his] attorneys or taking any effective action on his own behalf to obtain his day in court." *Makarow*, 403 N.W.2d at 566.

her legal rights nor do they even attempt to establish that West has been *continuously* insane since the assaults first began.  The letters from Dr. Mistry and Ms. Peebles thus do not create a material factual dispute with respect to West's claimed insanity.

Second, while Dr. Matossian's report and follow-up letter arguably do suggest that for some period of time West may have been unable to comprehend her legal rights, Dr. Matossian's submissions do not create a material factual dispute as to whether West was *continuously* unable to comprehend her rights throughout the *entire* period that she seeks to toll (i.e., the date of the assaults to at least one year prior to the filing of the Complaint).  *See, e.g. English*, 9 F.Supp.2d at 808 ("To prevent the one-year period from beginning to run [under the Insanity Tolling Statute], [a] condition of incapacity must be continuous").  Indeed, Dr. Matossian never identifies a clear time at which West's claimed insanity began.  For example, he suggests that West's psychological defense mechanisms may have prevented her from seeing herself as a victim at some *undefined* "point" after she began using drugs and engaging in prostitution.  (ECF #36-4 at 6, Pg. ID 523.)  And the first specific time frame during which Dr. Matossian identifies West as having been mentally ill is 1993, approximately two years after the assaults ended and two years into the period she wishes to toll due to her claimed insanity. (*See* ECF #40-7, Pg. ID 819.)

Moreover, Dr. Matossian appears to identify periods during which West *could* comprehend her legal rights. He says that West *would* have had the ability to see herself as a victim when she "quit[] prostitution in favor of a less unhealthy relationship," and he indicates that West "tried to get away from drugs and prostitution in 2005-6." (ECF #36-4 at 6, Pg. ID 523.) He also believes that West became more "angry" about the alleged assaults during this same "2005-6" time frame (*id.*), and West's anger suggests that she understood that what happened to her was wrong. Moreover, Dr. Matossian opines that West's condition "made it impossible for *most* of the intervening years to advocate for herself on this issue." (*Id.*; emphasis added.) In sum, Dr. Matossian's submissions, even when viewed in the light most favorable to West, do not create a material factual dispute as to whether West was continuously insane during the *entire* time that she seeks to toll.

For all of the reasons stated above, West may not defeat the Defendants' motion for summary judgment by invoking the Insanity Tolling Statute.

### D.    West is Not Entitled to an Tolling of the Limitations Period on Equitable Grounds

West argues in the alternative that the statutes of limitations should be tolled on equitable grounds. (*See, e.g.,* ECF #44 at 17-20, Pg. ID 941-945.) West appears to rely on two separate equitable theories: "Equitable Tolling" and "Equitable Estoppel." (*See id.*)

West first argues that the Defendants "should be equitably estopped from invoking the statutes of limitations as a defense" because they wrongfully "induced [her] to refrain from bringing a cause of action" against them. (*See id.* at 17-19, Pg. ID 941-943.)  The Court disagrees.  Under Michigan law, "[f]or equitable estoppel to apply, plaintiff must establish that (1) defendant's acts or representations induced plaintiff to believe that the limitations period clause would not be enforced, (2) plaintiff justifiably relied on this belief, and (3) she was prejudiced as a result of her reliance on her belief that the clause would not be enforced."  *Fuller v. Geico Indem. Co.*, --- N.W.2d ---, 2015 WL 966044 (Mich. App. Mar. 5, 2015) (quoting *McDonald v. State Farm Ins. Co.*, 747 N.W.2d 811, 819 (Mich. 2008)).

West does not allege that any Defendant told her (or suggested in any way) that the statutes of limitations would not be enforced.  Instead, West claims that certain Defendants made comments to her "under the table" about keeping the alleged abuse a secret and told her something to the effect of "don't say nothing, keep quiet, you know."  (*Id.* at 77, Pg. ID 492.)  But West acknowledges that the Defendants did not make "a direct threat," were not "specific," and never told her "don't go the police."  (West Dep. at 78, 92, 117, Pg. ID 492, 495, 502.)  Even if the statements identified by West may have induced West not to report the alleged assaults, the statements cannot support application of equitable estoppel under

23

Michigan law because they did not communicate to West that Defendants would not enforce the applicable statutes of limitations.  *See Fuller, supra* (essential element of equitable estoppel is conduct by defendant that leads plaintiff to believe statute of limitations will not be enforced).  West has not cited any authority suggesting that a Michigan court would apply equitable estoppel on the facts and circumstances she alleges here.

West next argues that she is entitled to "equitable tolling" of the statutes of limitations.  Her entire argument on this point is as follows:

> Equitable tolling is utilized to prevent unfairness to a diligent plaintiff. 51 Am Jur 2nd Limitation of Actions Sec 175, p 563. Equitable tolling is intended to serve the ends of justice where technical forfeitures would unjustifiably prevent a trial on the merits.  In *Lewis v. DAIIE*, 426 Mich 93 103, 393 NW2d 167 (1986), the Michigan Supreme Court recognized equitable tolling.  *See Devillers v. Auto Clus Ins Ass'n*, 473 Mich 562, 702 NW2d 539 (200[5]).
>
> In this case, the defendant's [sic] actions were unconscionable, while doing so under the color of law.  Not only sexually assaulting a teenager, but then convincing her not to tell anyone about it.

(*Id.*)

The cases cited by West do not support her argument.  While the Michigan Supreme Court may have recognized a type of equitable tolling in *Lewis*, the first case West cites, that court expressly overruled *Lewis* in *Devillers*, the second case she cites.  *See Devillers*, 702 N.W.2d at 542.  Moreover, in two more recent

24

decisions, the Michigan Supreme Court has severely limited, if not completely eliminated, the equitable tolling doctrine West attempts to invoke. *See Trentadue v. Buckler Lawn Sprinkler*, 738 N.W.2d 664, 680 (Mich. 2007); *Chabad-Lubavitch of Michigan v. Schuchman*, 862 N.W.2d 648 (Mich. 2015) (peremptorily reversing Court of Appeals decision applying equitable tolling). If and to the extent equitable tolling exists under Michigan law,[5] West has not provided any authority or basis for applying the doctrine in this case.[6] Accordingly, the Court will not do so.

---

[5] The Court is not making any ruling as to the current viability of equitable tolling under Michigan law. The Court simply concludes that even if equitable tolling does exist under Michigan law, West has not provided any legal support for her argument that the doctrine properly applies here.

[6] The Court's discussion of tolling above – both under the Insanity Tolling Statute and under equitable principles – focused on Michigan law. The Michigan tolling rules discussed above apply to West's claim under § 1983 because "a federal court must borrow state statutes of limitations and tolling rules in a § 1983 action." *Guy v. Lexington–Fayette Urban Cnty. Gov't*, 488 Fed. App'x 9, 18 (6th Cir. 2012). Thus, for all of the reasons explained above, the statute of limitations was not tolled with respect to West's § 1983 claim.

## **CONCLUSION**

For all of the reasons explained above, the Court concludes that the statutes of limitations applicable to Wests' claims were not tolled and that all of West's claims are time-barred.   Accordingly, **IT IS HEREBY ORDERED** that Defendants' Motions for Summary Judgment (ECF ## 33, 35, 36, 37, 38) are **GRANTED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  July 22, 2015

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on July 22, 2015, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113